May it please the Court, I'm Joe Stulegros for the Steelworkers Union. I'd like to reserve three minutes for rebuttal. This is a case in which, for the employer, the burden shifts to the employer upon any finding of animus. We have animus galore here, with five undisputed violations of federal labor law against this specific individual before the events which ultimately led to his discharge. There are also two discharges of prominent union supporters during the course of the union organizing campaign. Based on that as background, there is no substantial evidence for the Board's conclusion that Marcelo Piñero was not provoked in his outburst which led to his discharge. There is no substantial evidence for the Board's conclusion that another employee, Martin, is comparable in the situation in the events which ultimately led to his discharge. Those events included shouting at his supervisor, swearing at him, threatening him, and ultimately spitting at this supervisor. I urge you to not permit this jurisprudence to go forward with the understanding that as far as the NLRB is concerned, spitting is equivalent to what Marcelo Piñero did. What did he do? An unlawful act was committed against him because of his union activities. That is undisputed. His response was to utter profanity. When you say the unlawful act, that's saying that the seniority system is the reason that he ended up in this overtime situation. Exactly. So when he responded, he responds with profanity to be sure. And inappropriate profanity, we admit, but profanity is widely used in the workplace. What he uttered in the undisputed conclusion of the ALJ was uttered in frustration, not in anger, and not at the supervisor. There was certainly incidents where cursing in the direction of the supervisor, because it was clear that he was in the presence of the supervisor and expressing his frustration to him, Mr. Piñero, where those individuals were disciplined. And in fact, Piñero was disciplined before for having cursed one of his coworkers. Yes. That was a coworker, and in that situation he threatened the coworker. He received no disciplinary action notice for that incident. It appeared on his general work performance record. Was that used? Did Tower mention that as a basis when it fired him? No. How do we know that? Because the separation report includes a provision, a place where you can say prior related disciplinary action. And that box was blank. There was no consideration by the employer of that prior incident. So what we're faced with is an employee who's been provoked improperly. Let me talk about two other comparable employees who engaged in situations which were, we believe, much more similar than Martin. And we believe not only are they more similar than Martin, but that the board could not find otherwise. Those are the employees Scott and Viramontes. Scott engaged in a verbal altercation with an employee for which he received a D.A.N. A month later, he threatened that employee and engaged in a physical assault, including choking the employee. He remains at work. And yet the employer discharged Pinheiro for his statement in frustration. The other employee is Viramontes, who swore at the supervisor in contrast to Pinheiro, whose comment was uttered in frustration. And he said directly to the supervisor, all right, I'll go home. In other words, he directly refused the supervisor's direct order. Now, the board found that it is lawful for the employer to have a difference between supervisors and employees when viewing these disciplinary events. But when an employee directly refuses a supervisor's order and is yet permitted to remain at work, he was not suspended, he was not discharged. They said they needed him, right? Yes. He was an important function, and they suspected that Rogers had provoked him in some sort of significant way. Yes, that's right. Those are the two factors with Viramontes that mitigate his situation, provocation and the fact that the employer at least subjectively viewed him as a productive worker. Recall that under the right-line burden, the board mistrusts subjective statements of the employer. It's not often that an employer admits that they have discharged an employee for union activities. So what is the objective evidence of Viramontes' productivity? We're looking in vain. Where is the objective evidence that Pinheiro was not productive? There is a little bit. So I grant you that. There is a disciplinary action notice from 2002. But then there are also the unlawful disciplinary action notices against Pinheiro, January 31, 2003, and March 25. At the time of Pinheiro's discharge, the employer still had those in its file. And I know the intervener in this case argued that the employer considered only the 2002 D.A.N. in determining whether Pinheiro had a poor work record. But there were the three incidents, I guess, which resulted in the D.A.N. And then there was the D.A.N. Where he was partially or he had made a whole responsibility. Right. But, Your Honor, that is yet another D.A.N. That's the one that was issued in September. But the point that I'd like to make is that the employer must, as of October 2003, still have been relying on the January 2008, excuse me, January 2003 and March 2003 D.A.N.s, which indisputably were overturned by the board in the other case. Were those listed in the reason for discharge? No. There is a reference in the D.A.N. to poor work record. So it's a little bit ambiguous as to what exactly the employer was relying on. However, there is no substantial basis for the board to conclude that the employer did not rely on those incidents. Is there any other record that you would look to for the poor work record that would be in his records? Well, he does have the 2002 D.A.N. and the September 5th D.A.N., which is a subject of the litigation before this Court. And as to that D.A.N., as we've briefed to you, there is the first incident was without, was, remember, that Pinheiro is a floater. They put him as a floater. In other words, he's got to deal with new machines. Everyone recognizes that that puts an additional burden on the employee and mistakes are more likely to occur. Do they give him more credit or leeway for that? No, they don't. They say, and this is that very first incident on the D.A.N., August 21st. They say that he, even though it was the first time that he programmed the machine, even though he felt a little unsure and so he went to check with his supervisor. Hey, did I do this right? The supervisor made a mistake and said, yeah, that program's okay. Go ahead and run it. Well, there was no way for him to respond other than that. I mean, what did he do wrong? The second incident, he admits he did not do it correctly. But, again, the Board here relies on the fact that there were other employees who were disciplined for a single discrepancy report. But there were also employees who were not disciplined for three or four discrepancy reports. So what do we have here? What are the bounds of the employer's discretion? If it's pure discretion, there's no basis for the Board to conclude that it was not for union activities. So what we have is a standardless enterprise where the Board has said, if it's one, if there's one, that's good enough for us. That's not substantial evidence. There is no evidence that this second discrepancy report was particularly severe, that, for example, the part was scrapped. The only explanation the employer gives for the DAN really is that they wanted him to pay more attention. In other words, it's the repetitive nature of these violations, three within a seven-day period, when, of course, two out of the three had no basis whatsoever. The third. I know it's hard to look at these in the abstract, but when we're on these kind of cases, you have to overcome the standard of review in order to rule in your favor. Yes. I'd like to look at that. If you didn't have the anti-union animus that preceded these firings, in his case, would there be justification for firing him based on the record? I don't think there would be any legal grounds to contest his firing. An employer can fire for any reason or no reason at all. So the only thing that distinguishes him from the other three employees listed is the timing of his rehiring and the context in which he's being judged. Is that essentially it? Essentially, the standard is the board assumes that these other employees who were not who didn't have the anti-union animus were disciplined for the reasons that the employer customarily follows. And if the employer customarily follows its normal procedures with regard to Pinero, then he would have been discharged regardless of his anti-union activities. But if these other employees show that, in fact, they were more strict with Pinero than they would be with other employees, that's unlawful, and that must be sustained by the board and the court in returning him to work and restoring him to the dignity which he lost when he was discharged. Now, one thing I, of course, will ask the other side of that, but he did apologize. We don't – is there anything in Martin, Viramontes, and Scott that's equivalent to an apology right after the event? No, and, in fact, with Scott, Scott was given an opportunity to take anger management counseling and was given various opportunities. He did not avail himself of those. He was ultimately returned to work after he did change his mind and go through the anger management counseling. But, again, with the anger management, it suggests that the employer had, you know, this notion of kind of working with employees. So Scott was discharged? Scott was discharged. Ultimately – and he was given a choice, take a two-week suspension in anger management or take discharge. He took the discharge but subsequently changed his mind and was eligible for rehire. That's not the case with Pinero. Again, on this question of provocation, with Viramontes, there was evidence that the company said he may have been provoked. It's not much more than that. But with Pinero, the board said he wasn't provoked at all. Why not? Because the supervisor was calm. There's no substantial basis for that. And the reason is if you speak with a calm voice and you're in a position of authority and you threaten an employee or you say something unlawful to an employee, that can be just as infuriating. My daughters accused me of just the same thing. But, I mean, there's no basis to say just because it's calm, that provocation doesn't matter. I'd like to save the remainder of my time for rebuttal. Thank you. MS. BEARD. Thank you, and may it please the Court. My name is Heather Beard, and I represent the National Labor Relations Board, which is seeking dismissal of the union's petition for review in this matter. At the outset, I would like to cede three minutes of my time to the intervener, Allied, if that's okay. Okay. In this case, the record amply demonstrates that the company acted for legitimate reasons in both actions at issue. First, the disciplinary action notice for Mr. Pinero, acting three times in a row, making an error and suspending and discharging him for rude and insubordinate behavior toward his supervisor. An outburst that is conceded is inarguably rude and insubordinate to his supervisor. Now, we agree with the union that the context of this case is extremely important. And what the board did not do is what the union is claiming that the board did, which is ignore the evidence of animus in this case. In fact, what the board did, under the standard of review that we have, is meticulously considered all of the evidence both for and against finding an unfair labor practice. And after looking at all the instances that the company had acted unlawfully, they looked at all the other instances in which the company had acted lawfully. And when they looked at these circumstances under this record, what the board did is find that the company did meet its burden of proof, which is that it would have issued the DAN to Mr. Pinero in September and it would have discharged him based upon actions of his own making and not of the unlawful labor practices that the board also found in this case. But what about the provocation issue that the union raises? Why wasn't – why didn't that make a difference and distinguish him from the other cases? Sure. I believe what the board said was reasonable on this point in one of their footnotes, which was that when the company is considering comparables, Mr. Veramontes and the provocation of Mr. Veramontes, that you look to what happened between Mr. Sedano and Mr. Pinero. It's absolutely correct that Mr. Sedano was talking in a calm voice. What's also correct is that Mr. Pinero was coming to this conversation already upset, very upset, because he had mistakenly believed that he had missed an overtime opportunity. And the testimony is that Mr. Pinero was screaming and was extremely upset in this conversation. And so when you take a look at the provocation that the board looked to when it considered the company's Veramontes analysis, it was quite different from what happened between Mr. Sedano and Mr. Pinero. And granted, Mr. Sedano did start that conversation when he opened – when he talked. He did say that we were going by the book with regard to seniority because of the problems at the labor board. Absolutely. And the board recognized this. And, in fact, the board recognized this is an underpinning for a finding of animus. But that's not where we stop. We continue to look at what transpired in that conversation, and we continue to look at the circumstances, including – I think it's very key here that the board absolutely considered Mr. Pinero's poor work record. It's cited in the disciplinary act. You know, when the whole conversation was kicked off by something that was simply not true – I mean, if your supervisor comes in and he tells you X, which is totally a lie or fabricated or trumped up, he quickly responds to that, goes away, and then comes back and apologizes. So one of the things that seems to me is if you lay out all these other cases is, you know, there's only one where he was actually terminated upright, and that's Mr. Martin, correct? That's correct. And, you know, you don't have – he basically went ballistic, they're saying, and, you know, never came back and apologized. He wasn't provoked by something that was untrue in the face of a union, you know, all this anti-union background. So I'm having some trouble in looking at the other three incidents to try to say, well, it's justified because of what happened to Martin, because that's what it would have to boil down to, it seems. I do understand the Court's concern, and I think that it's a close case with regard to what a company does when it has insubordination and rude behavior that inarguably contrasts with its handbook. And in this instance, what the Board did is it said, look, we can't find a case. It's going to be quite difficult to force the employer to achieve a standard of rigid precision to find a case on all fours. And certainly, Mr. Martin did also spit on his supervisor. But we would submit that when the Board considered all of this, in addition to Mr. Pinheiro's earlier prior-to-union activity altercation that he had with a co-worker in which he threatened the co-worker that Mr. – that deciding to discharge Mr. Pinheiro on those bases was something that the company would have done in the absence of any of his union activity. But that tower didn't rely on that co-worker dispute. Well, it wasn't that tower didn't rely – are you talking about with regard to Mr. Scott, Mr. Scott, who had the – Mr. Pinheiro. Right. I think that's a point that the union has made, but I would contest it. I would say that if you take a look at the separation report, which is – is that 121, S.E.R. 121? 121, yes, in the supplemental excerpt of record. And you read the third sentence in, you have a poor work record and this misconduct cannot be tolerated. The question then becomes, what is his poor work record? And his poor work record is seen in the evidence of his last performance evaluation, which in Allied 1, the board found, with no exception, to be a lawful performance evaluation. And that performance evaluation, which you can find in the S.E.R. a couple pages later, which is page 123, describes with regard to his attitude at the very bottom factor, threatened to fight one of his coworkers. If you have a problem with a coworker, tell management do not threaten anyone. So on the basis of the company's recitation, what the board did is on the basis of the company's recitation in this discipline of his poor work record, the board found that this wasn't the first instance of Mr. Pinheiro having shown rude and insubordinate conduct. Indeed, he had made a threat before. And so because we have no case that's going to ever be on all fours, and we have an inarguably rude and insubordinate comment, and we have lawful actions that the company took against Mr. Pinheiro, for example, when the company recalled him from layoff, and then the union challenged the overtime that Mr. Pinheiro was given, and the board assessed it meticulously and found that he was not discriminated against with regard to his overtime. So in light of review here, what the board did was well within its discretion in finding that there was substantial evidence that had Mr. Pinheiro not acted. I think there's some evidence. The question I'm having is whether it's substantial. And I'm trying to get some meaning to that term. Because generally, we kind of throw this stuff around, and we just say these things, and then we write them, and you say them back to us. And so I'm just trying to figure out what's the difference between some evidence, which there definitely is, and substantial evidence. Would you address that? Sure. I think that substantial evidence in this case would be that there is – it's not irrational for what the board did, that there is something – I believe that the D.C. Circuit has said that no fact-finder could ever – you know, the record is so compelling that no fact-finder could find otherwise. Can I intercede, if I may? Maybe you can clarify something. That picks up where Judge McKeown just left off. First of all, can we agree that there was substantial evidence that Mr. Pinheiro not acted? I would agree that the board's determination really addressed the – whether the Respondent carried its rebuttal burden. I think the board clearly said that that's what we're dealing with, okay? I would agree. And you bandy about words. Insubordination was the basis for the discharge, I think. Then you say rude and insubordinate, you combine the two. What basically are we dealing with, insubordination, rudeness, or both? Okay, well, looking to what the disciplinary action notice says, it did say this is considered an act of insubordination. Of insubordination. Let me just go to this now. All right? Maybe you can clarify. I'm looking at footnote one of the board's decision. Okay? We have a split decision, and it talks about the fact that the board has accepted the credibility of resolutions, and specifically that the board has accepted the credibility resolutions. of the ALJ. So it's not challenging the credibility determinations of the ALJ. In fact, in footnote one, the board specifically says we respectfully affirm the judge's demeanor-based credibility determination concerning the testimony of employee Marcelo Pinheiro. Now, bear with me. I look at what that credibility determination by the ALJ was, and I'm reading from this part of the ALJ's decision where he says what is relevant is whether the remark was made in anger directly to Sedano or in frustration as a comment regarding Pinheiro's feelings. I find the latter to be the case. Pinheiro and Barragan convincingly testified regarding the manner in which the expletive phrase was delivered. Sedano's testimony at this point was vague and is not credited. Moreover, Pinheiro apologized to Sedano after explaining that he had not made a comment directed to Sedano but rather a comment of frustration over his belief that he was not receiving as much overtime as he deserved. But it seems that we're bound, as a matter of law, to accept that credibility determination. And when the board then goes on to say Pinheiro's conduct was arguably rude and insubordinate and his discharge was consistent with the respondent's disciplinary policy, and it just seems to me that the board is not accepting the credibility determination that the ALJ made and that what you have here is not credible. And where do you have anything in this record that can support the board's determination that it's okay to discharge somebody because they made a comment out of frustration? Okay. Well, what I would say is that the board is bound by the ALJ and took the ALJ's credibility determinations. However, the board drew a different inference from those credibility determinations. And with the board bound the board doesn't say that. The board doesn't say that, you know, we accept the credibility determination. This was out of frustration. However, you know, the employer has discharged other people out of frustration with apologies. And we do, you know, infer from this. That this was rude and insubordinate. There's nothing at all that the board says about that. Well, when the board says that it's inarguably rude and insubordinate. And I believe that the union does not contest that. It's only inconsistent with what the ALJ said. Well, the ALJ did say that it was said in frustration. However. Not insubordination. It's the opposite of insubordination. What I would say to keep in mind is that the board does not sit in judgment of the company's business reason in terms of whether it's good or bad. It simply looks to what it honestly thought that it was doing at the time and would it have done the same thing. And if I could. Wrap up because I know you're calling once. Yes. We would say that what the board did here was well within its discretion of determining that the company met its rebuttal burden on both instances of discipline to Mr. Pinheiro. Thank you. Thank you. Could you set the clock back to up to three minutes? Morning, your honors. My name is Pat Jordan. I represent the intervener. Rarely have I spent so much time figuring out how to say so little. So I'm going to try to be as concise as I can. I've listened to the argument. I've read all the briefs as you have. You're obviously well informed. It strikes me that what we're doing is re-arguing the case on the merits, that this is turned into a de novo review and it is not a review of whether or not the board did its job. In my judgment, what the board did was to simply go, not simply, but it went through an excruciating detail. Each of the findings, each of the conclusions made by the ALJ, every single argument made by the union, the general counsel who prosecuted the case. And it ultimately said, look, on balance, this employer may not be the best actor in the history of the world. It may have violated the law in some instances, but here's what it didn't do to violate the laws against Mr. Pinheiro. He was warned in 2002, found an allied one to be lawful. He's warned again in 2003, found to be lawful. His performance evaluation was found to be lawful, wherein it was noted that he had verbally assaulted and threatened another employee. His layoff was lawful. And the overtime for me just is a huge issue. The ALJ found that there was a denial of overtime for Mr. Pinheiro. The board reversed that and found, based upon its, again, detailed analysis of the facts, that he wasn't denied overtime. The union does not come before you appealing that element of the case. And let's remember what happened on October 3rd. On September 29th, Mr. Pinheiro received a work schedule for 50 hours of work, 10 hours of overtime, which would have all taken place on the Friday in which he uttered the words to Mr. Sedano. But for his mistake, but for his error, we wouldn't be before you. The employer didn't try to fool him or tell him, gee whiz, we didn't really mean for you to work. He made a bad mistake and he was properly assigned overtime. He comes in the next Monday steamed for reasons that were his own doing. And he verbally assaults Sedano immediately. And when Sedano says and uses perhaps some magic words that weren't appropriate and simply says, look, I think you were treated, in essence, he said, I think you were treated fairly, witness the fact that the guy was scheduled for 50 hours of work. The response was, and you've read it, that's inappropriate. Under any circumstances. I've litigated discharge cases for more years than I hope to tell you. And what the board did in this case, perhaps sub silentio, was to say he did not protect his job. Every employee has at some point some obligation to protect their job. He didn't. He could have used almost any other statement except what he did, and he probably, he wouldn't not have been fired. Instead, he chose to be rude, insubordinate, and the fact that his apology. That's not what the AOJ said. The AOJ accepted his demeanor. It's totally inconsistent with what you just told me. The board found that the comment was rude and insubordinate as a matter of inference. But the point is that the findings as to the credibility and the demeanor of the employee, you seem to just gloss over that. No, I don't. I don't mean to lose sight of that at all, Your Honor. I think the board, as counsel has argued, drew a different inference as to the nature of the words. We're dealing with unannounced inferences that we have to agree from the board's decision. Okay. I think, well, we part company on that one. There's no claim that the speech. I think we have your point well in mind, and I've given you an extra minute as well. And there's no claim that the speech, the words themselves were protected activity. That's outside the scope of this appeal. Thank you, Your Honors. On this point of the AOJ, the credibility as to facts are accepted. The board has applied things differently on certain questions of law, but the facts are as the AOJ found them. You're correct. There is no evidence of any verbal assault prior to the unlawful activity of the employer. When an employee is upset about an issue and comes to talk to his supervisor, and the supervisor responds, hey, you know, really what happened is you just read the schedule wrong, the supervisor can diffuse things and cause no problem. But when the employer then, when the supervisor commits an unlawful statement, that's a different story. Next question is this question of whether the prior D.A.N. was relied upon by the board under the guise of poor work record. What the board would have you believe is that the employer, well, essentially what's happened is the board has substituted its own judgment for that of the employer. The employer disciplined the employee and separated the employee, in part as referenced in the separation notice, for poor work record. That's 121 of the employers. And it refers to that, but it cites no prior misconduct, as in D.A.N.s. Now, the board would have you believe that this only involves the prior threat that was mentioned on a performance review. But remember that on that work review, it also says overall quality good. The overall review is good. The only question of poor attitude is, of a poor job performance is with respect to attitude. And that one was not even significant enough that the employer would issue a D.A.N. So the other thing is that the board must assume that the employer did not rely on the January 31st D.A.N. or the March 25th D.A.N. So essentially what's happened is we know that reliance on these, if you're encompassing the whole poor work record, the company must be relying on these other incidents. So what the board has done is said, okay, these other incidents, if the board were to rely on them, that would be pretext. That's unlawful. But if you strip them out, then what the board is doing is substituting its own business judgment for that of the employer. This it cannot do. We ask you to please restore this man to his job. Thank you. Thank you. Thank all the counsel for your argument this morning in case of the United Steel versus the NLRB is submitted and we're adjourned for the morning.
judges: McKeown, Ikuta, Block